UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| LEONARD J. VOGEL | ) | |
| (Social Security No. XXX-XX-9609), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 4:10-cv-20-WGH-RLY |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM DECISION AND ORDER

This matter is before the Honorable William G. Hussmann, Jr., United States

Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 10, 27) and an

Order of Reference entered by Chief District Judge Richard L. Young on January 19,

2011 (Docket No. 28).

### I. Statement of the Case

Plaintiff, Leonard J. Vogel, seeks judicial review of the final decision of the

Agency, which found him no longer disabled as of March 12, 2008, and, therefore, no

longer entitled to Disability Insurance Benefits ("DIB") under the Social Security Act

("the Act"). 42 U.S.C. §§ 416(i), 423(d); 20 C.F.R. §§ 404.1520(f), 404.1594. The Court

has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

Plaintiff applied for DIB on June 14, 2005, alleging disability since February 3,

2005. (R. 75-77). Plaintiff was found to be disabled and entitled to DIB on September

14, 2005. (R. 23). On November 1, 2007, Plaintiff was notified that the Agency would be conducting a continuing disability review. (R. 34-35). The Agency determined initially and upon reconsideration that Plaintiff's DIB should cease as of March 12, 2008. (R. 40-43, 45-47). Plaintiff appeared and testified at a hearing before Administrative Law Judge D. Lyndell Pickett ("ALJ") on December 17, 2008. (R. 371-91). Plaintiff was represented by an attorney; also testifying was a vocational expert. (R. 371). On January 20, 2009, the ALJ issued his opinion finding that Plaintiff was no longer disabled as of March 12, 2008, because his disability no longer met a listing and because he retained the residual functional capacity ("RFC") to perform a significant number of jobs in the economy. (R. 12-19). The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 4-6). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on February 19, 2010, seeking judicial review of the ALJ's decision.

## II. Statement of the Facts

### A. Vocational Profile

Born on November 26, 1957, Plaintiff was 52 years old at the time of the ALJ's decision, with a high school education. (R. 18). His past relevant work experience included jobs as a maintenance mechanic and carpenter. (R. 17).

### B. Medical Evidence

#### 1. Plaintiff's Impairments

Plaintiff saw Leon Michl, M.D., on September 22, 2006. Dr. Michl noted a large defect in his left upper quadrant and tracheal stenosis. (R. 234).

Plaintiff visited his treating physician, George Alcorn, M.D., on September 15, 2006, with complaints of chronic coughing and chronic bronchitis. (R. 253-54). A chest x-ray on September 15 revealed that Plaintiff's lungs were unchanged from 2005 with moderate emphysema. (R. 255).

Plaintiff saw Dr. Alcorn on April 23, 2007, with complaints of decreased energy and chronic obstructive pulmonary disease. (R. 249-50). He was experiencing the collapse of his trachea with coughing. (R. 249). Plaintiff suffered from shortness of air with and without activity. Dr. Alcorn indicated that Plaintiff's impairment included a diagnosis of Acute Respiratory Distress Syndrome ("ARDS"); he explained that Plaintiff's diagnosis was "consistent with a gentleman with severe chronic obstructive airway disease on top of underlying ARDS . . . ." (R. 250). He recommended that Plaintiff cease smoking. (R. 250).

Plaintiff revisited Dr. Alcorn's office on July 23, 2007, complaining of fatigue and weakness. (R. 247-48). It was noted that Plaintiff smokes three/fourths of a pack of cigarettes a day. (R. 247). Dr. Alcorn's assessment was that "the dyspnea related to ARDS [caused] an increased work of breathing." (R. 248).

On October 8, 2007, Dr. Alcorn wrote a letter detailing his treatment history of Plaintiff that dated back to early 2005. (R. 246). Dr. Alcorn indicated that Plaintiff had been exposed to chemicals which caused swelling in his hands, loss of skin, and breathing problems. Dr. Alcorn further indicated that "[f]rom a lung standpoint I would consider him greater than 50% impaired," and he opined that Plaintiff has "little chance of improvement" and will remain in a very disabled state. (R. 246).

On November 5, 2007, Plaintiff met with Dr. Alcorn for complaints of back pain. (R. 241-42). Dr. Alcorn noted that Plaintiff was a seriously ill gentleman who almost died. (R. 241). He found no evidence of radiculopathy. (R. 241). Plaintiff then had an MRI of his lumbar spine on November 5 which found T12 and L1 vertebral bodies wedged anteriorly "consistent with compression fractures of indeterminate duration" but not evident on previous x-rays of February 4, 2005. (R. 243). Plaintiff also had moderate spondylosis. (R. 243). A bone scan on November 8 indicated that the wedging was an old injury. (R. 240).

On November 15, 2007, Plaintiff was seen by Dr. Alcorn with complaints of back pain, and Dr. Alcorn diagnosed osteoarthritis of the back. (R. 238-39). Dr. Alcorn noted no radiculopathy. However, Dr. Alcorn noted that Plaintiff's lungs were impaired due to ARDS (R. 238), and he also noted that Plaintiff's "pulmonary impairment is difficult to quantitate because it is not simply a matter of ventilatory component. ARDS causes a diffusion abnormality, particularly in exercise, so he is at least 50% impaired or more" (R. 239).

On February 4, 2008, Plaintiff underwent a consultative physical examination conducted by James T. Baumberger, M.D. (R. 277-82). Plaintiff told Dr. Baumberger that he had been exposed to a chemical while at work and had been hospitalized for seven months, beginning in February 2004, with four months in the intensive care unit. (R. 277). Plaintiff also suffered from arthritis in his back which was supported by x-ray evidence; Plaintiff was taking Hydrocodone for pain. (R. 277). Dr. Baumberger's exam revealed a cough with clear or yellow sputum and shortness of breath with coughing.

Plaintiff indicated that he could walk for five minutes and perform basic activities.  (R. 278).  Plaintiff had a normal gait, could bend over, and was stable at station.  (R. 278).  Testing revealed an $FEV_1$ of 72%.  (R. 280).  Dr. Baumberger's findings included mild obstructive lung disease – unsure of diffusion capacity.  (R. 280).  After the examination, Dr. Baumberger concluded that Plaintiff should be able to work eight hours a day in a seated, standing, or ambulatory position and that he could lift 10 pounds continuously and 20 pounds occasionally.  (R. 281).  He had full use of his upper extremities for grasping, pushing, pulling, or manipulating, as well as full use of his lower extremities for operating foot controls.  (R. 281).  He could work around moving machinery and continuously operate automotive equipment, but he would have difficulty working in extremes of temperature or humidity or with exposure to dust, fumes, or gas.  (R. 281).  He could bend and squat occasionally.  (R. 281).

On April 14, 2008, Plaintiff had chest x-rays at Saint Catherine Regional Hospital with a finding of "[h]yperinflation of the lungs compatible with chronic obstructive pulmonary disease."  (R. 369).

On May 8, 2008, Plaintiff had an office visit with Dr. Alcorn who noted a lot of coughing.  (R. 314).  On May 14, 2008, a CT of the chest revealed scarring and thickening of the lungs as well as a 2.9 cm rounded cystic lesion.  (R. 313).

On May 27, 2008, Plaintiff was admitted to Saint Catherine Regional Hospital for a bronchoscopy and an inpatient stay of five days.  (R. 322-27).  Plaintiff was admitted with complaints of cough, abnormal x-ray, fever, and loss of appetite.  (R. 322).  Dr. Alcorn explained that Plaintiff had a "left lower lobe abscess like material, bronchiectasis,

probably all related to some of the permanent damage that was done in his battle with respiratory failure . . . . He has an upper airway partial obstruction related to the functional collapse of his tracheostomy site." (R. 324). Dr. Alcorn noted, "chronic lung disease, complicated by chronic obstructive pulmonary disease." (R. 325). The discharge summary for this five-day hospital admission stated that Plaintiff was found to have findings consistent with a lung abscess, as well as upper airway functional obstruction. (R. 322). Chest x-rays revealed lung scarring most likely related to chronic obstructive pulmonary disease. (R. 347).

On July 7, 2008, Plaintiff presented to Saint Catherine Regional Hospital for chest x-rays. Dr. Alcorn noted that the x-rays revealed scarring of both lungs and calcified granulomas. (R. 362).

On July 22, 2008, Dr. Alcorn completed a single-page "Physical Capacities Evaluation" form. (R. 308). Dr. Alcorn indicated that Plaintiff could sit, stand, and walk for no more than two hours each at one time, and he could also do those activities for no more than a total of two hours during an entire eight-hour workday. Plaintiff could occasionally lift up to 10 pounds, but he could never carry any weight at all. He had no limitation on the use of his hands or the use of his feet for pushing and pulling leg controls, and he could occasionally reach, but never bend, squat, crawl, or climb. He was mildly limited in his ability to drive automotive equipment and totally limited in his ability to be exposed to marked changes in temperature and humidity or to dust, fumes, and gases. (R. 308).

On August 8, 2008 Plaintiff had another CT scan which was consistent with prior CT scans and indicated a stable area of scarring and a stable cystic thick-walled abnormality. (R. 358).

### 2. State Agency Review

On May 7, 2008, B. Whitley, M.D., reviewed Plaintiff's entire claim file and completed a Physical Residual Functional Capacity Assessment form at the request of the State agency. (R. 298-305). Dr. Whitley opined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently and could stand/walk and sit for about six hours each in an eight-hour workday. (R. 299). Plaintiff had no postural limitations. (R. 300). Dr. Whitley also opined that Plaintiff needed to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. (R. 302). A month later, on June 13, 2008, M. Ruiz, M.D., reviewed the evidence in the file and affirmed Dr. Whitley's opinion. (R. 305).

## III. Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997). This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson,* 402 U.S. at 399-400. Accordingly, this

Court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment

for that of the Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).

Thus, even if reasonable minds could disagree about whether or not an individual was

"disabled," the court must still affirm the ALJ's decision denying benefits.  *Schmidt v.*

*Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).


## IV.  Continuing Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that

he suffers from a "disability" as defined by the Act.  "Disability" is defined as the

"inability to engage in any substantial gainful activity by reason of a medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve

months."  42 U.S.C. § 423(d)(1)(A).  If disability benefits are awarded, the Agency must

periodically conduct continuing disability reviews.  20 C.F.R. § 404.1594.  To ensure that

these reviews are carried out uniformly, in an expeditious and administratively efficient

manner, in an objectively based and neutral way, and documented, the Agency will

conduct an eight-step review process.  *Id.*  The process is as follows:

> (1)  Are you engaging in substantial gainful activity?  If you are (and any applicable trial work period has been completed), we will find disability to have ended (see paragraph (d)(5) of this section).

> (2)  If you are not, do you have an impairment or combination of impairments which meets or equals the severity of an impairment listed in appendix 1 of this subpart?  If you do, your disability will be found to continue.

(3)  If you do not, has there been medical improvement as defined in paragraph (b)(1) of this section?  If there has been medical improvement as shown by a decrease in medical severity, see step (4).  If there has been no decrease in medical severity, there has been no medical improvement.  (See step (5).)

(4)  If there has been medical improvement, we must determine whether it is related to your ability to do work in accordance with paragraphs (b)(1) through (4) of this section; i.e., whether or not there has been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination.  If medical improvement is not related to your ability to do work, see step (5).  If medical improvement is related to your ability to do work, see step (6).

(5)  If we found at step (3) that there has been no medical improvement or if we found at step (4) that the medical improvement is not related to your ability to work, we consider whether any of the exceptions in paragraphs (d) and (e) of this section apply.  If none of them apply, your disability will be found to continue.  If one of the first group of exceptions to medical improvement applies, see step (6).  If an exception from the second group of exceptions to medical improvement applies, your disability will be found to have ended.  The second group of exceptions to medical improvement may be considered at any point in this process.

(6)  If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe (see § 404.1521).  This determination will consider all your current impairments and the impact of the combination of those impairments on your ability to function.  If the residual functional capacity assessment in step (4) above shows significant limitation of your ability to do basic work activities, see step (7).  When the evidence shows that all your current impairments in combination do not significantly limit your physical or mental abilities to do basic work activities, these impairments will not be considered severe in nature.  If so, you will no longer be considered to be disabled.

(7)  If your impairment(s) is severe, we will assess your current ability to do substantial gainful activity in accordance with § 404.1560.  That is, we will assess your residual functional capacity based on all your current impairments and consider whether you can still do work you have done in the past.  If you can do such work, disability will be found to have ended.

(8)  If you are not able to do work you have done in the past, we will consider one final step.  Given the residual functional capacity assessment and considering your age, education and past work experience, can you do other work?  If you can, disability will be found to have ended.  If you cannot, disability will be found to continue.

20 C.F.R. § 404.1594(f).

## V.  The ALJ's Decision

The ALJ determined that Plaintiff had most recently been found disabled on September 14, 2005; this was the "comparison point decision" ("CPD").  (R. 13).  At the time of the CPD, Plaintiff had seven impairments:  status-post thoracotomy; status-post tracheostomy; staphylococcus infection; respiratory failure; deep vein thrombosis of the left lower extremity; renal failure; and necrotizing pancreatitis.  These impairments in combination met Listing 5.07B at 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 14). The ALJ found that through March 12, 2008, the date Plaintiff's disability ended, he had not engaged in substantial gainful activity.  (R. 14).  The ALJ determined that, as of March 12, 2008, Plaintiff had two impairments that are classified as severe:  mild obstructive airway disease and degenerative disc disease.  (R. 14).  The ALJ concluded that these impairments did not meet or substantially equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 14).  The ALJ opined that medical improvement occurred as of March 12, 2008.  (R. 14).  The ALJ determined that Plaintiff's medical improvement was related to the ability to work because, as of March 12, 2008, the impairments from the CPD no longer met or medically equaled the listings. (R. 15).  However, the ALJ did determine that Plaintiff continued to have a severe

impairment as of March 12, 2008. (R. 15). The ALJ nevertheless, concluded that

Plaintiff retained the RFC for light work, except he could never climb ladders/ropes/

scaffolds; he could occasionally climb stairs/ramps, balance, stoop, kneel, crouch, or

crawl; he must be allowed a sit/stand option; and he can have occasional exposure to

extremes and must avoid concentrated exposure to dust/fumes/odors/gases and poor

ventilation. (R. 15-16). The ALJ opined that, as of March 12, 2008, Plaintiff did not

retain the RFC to perform his past work. (R. 17). However, Plaintiff could perform a

substantial number of jobs in the regional economy. (R. 18). The ALJ concluded by

finding that Plaintiff's disability ended March 12, 2008. (R. 19).

## VI. Issues

Plaintiff has essentially raised two issues. The issues are as follows:

1. Whether the ALJ properly rejected Dr. Alcorn's opinions.

2. Whether the ALJ's RFC finding is supported by substantial evidence.

**Issue 1: Whether the ALJ properly rejected Dr. Alcorn's opinions.**

Plaintiff argues that the ALJ committed reversible error when he failed to grant

controlling weight to Dr. Alcorn's findings concerning Plaintiff's lungs. 20 C.F.R. §

404.1527 provides guidance for how the opinions of treating and nontreating sources are

to be evaluated and explains as follows:

> (d) How we weigh medical opinions. Regardless of its source, we will
> evaluate every medical opinion we receive. Unless we give a treating
> source's opinion controlling weight under paragraph (d)(2) of this section,
> we consider all of the following factors in deciding the weight we give to
> any medical opinion.

(1)  Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2)  Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i)  Length of the treatment relationship and the frequency of examination.  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii)  Nature and extent of the treatment relationship.  Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.  For

example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) Other factors. When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your

case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

20 C.F.R. § 404.1527.

The ALJ in this case determined that Dr. Alcorn's opinion was not entitled to controlling weight because "it contrasts sharply with other evidence of record." (R. 17). Specifically, the ALJ's reasoning for rejecting Dr. Alcorn's opinion was because Dr. Alcorn had limited Plaintiff to never bend, squat, crawl, or climb, and because Dr. Alcorn's opinions were inconsistent with the opinions of Dr. Baumberger. The ALJ is required to "build an accurate and logical bridge from the evidence to [the ALJ's] conclusion," so that the court can trace the path of the ALJ's reasoning. *Scott v. Barnhart,* 297 F.3d 589, 595 (7th Cir. 2002). In this instance, the Court is unable to trace the path of ALJ Pickett's reasoning for rejecting Dr. Alcorn's opinions.

In July 2007, Dr. Alcorn's assessment was that Plaintiff's "dyspnea related to ARDS [caused] an increased work of breathing." (R. 248). Furthermore, on November 15, 2007, Dr. Alcorn noted that Plaintiff's lungs were impaired due to ARDS and that Plaintiff's "pulmonary impairment is difficult to quantitate because it is not simply a matter of ventilatory component. ARDS causes a diffusion abnormality, particularly in exercise, so he is at least 50% impaired or more." (R. 238-39). And, in fact, the evidence reveals that objective medical testing showed damage to Plaintiff's lungs consistent with a diagnosis of ARDS. (R. 313, 347, 362). Later, in May 2008, Plaintiff was hospitalized for five days with complications related to his lung impairment. (R. 322-27). It appears that neither the ALJ nor Dr. Baumberger properly addressed Plaintiff's diagnosis of

ARDS. Dr. Baumberger's exam of Plaintiff included a diagnosis of mild obstructive lung

disease – unsure of diffusion capacity. (R. 280). Therefore, the ALJ's reliance on Dr.

Baumberger's exam to discount Dr. Alcorn's opinions was improper. And, the ALJ never

noted Plaintiff's problems with diffusion, which involves the ability of oxygen to pass

into the blood from the lungs. Despite this oversight, the Court still cannot say, as a

matter of law, that Dr. Alcorn's opinions are entitled to controlling weight. Therefore,

remand is necessary so that the ALJ can properly evaluate Dr. Alcorn's opinions about

Plaintiff's ARDS and difficulty with diffusion.

**Issue 2: Whether the ALJ's RFC finding is supported by substantial evidence.**

Because the ALJ's RFC determination does not take into account the opinions of

Dr. Alcorn concerning Plaintiff's diagnosis of ARDS, the RFC findings are flawed. On

remand, the ALJ will need to conduct a new RFC determination.

## VII. Conclusion

The ALJ conducted an incomplete analysis of Dr. Alcorn's opinions regarding

Plaintiff's ARDS and difficulty with diffusion. Consequently, the Court cannot trace the

path of the ALJ's reasoning. The final decision of the Commissioner is, therefore,

**REMANDED.**

**SO ORDERED** the 24th day of January, 2011.

_____
William G. Hussmann, Jr.
United States Magistrate Judge
Southern District of Indiana

**Electronic copies to:**

William Edward Jenner
JENNER AUXIER & PATTISON LLP
wjenner@wjennerlaw.net

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov